## KARWICK *v.* PICKANDS.

1. EVIDENCE—FORMER TESTIMONY—DILIGENT SEARCH—WITNESS OUT OF JURISDICTION—SHOWING.

Evidence tending to prove that a witness who had testified at a previous trial had stated he was going to the State of Washington, that his acquaintances told plaintiff he had left Michigan, that the sheriff, who was called to the

stand, made oath that he had inquired of 15 or more people about the witness, and had been informed that witness was not in the State, *held*, to justify receiving the former testimony of the witness, given at a previous trial of the case; the sufficiency of the preliminary proofs being largely in the discretion of the trial court, and an affidavit of the sheriff showing diligent effort to serve a subpœna, having been offered as a part of the showing.

2. SAME—TRIAL—LOGS AND LOGGING.

*Held*, also, that no error such as to demand the reversal of the case had been committed in the reception of other evidence on the trial of an action for breach of a contract of towage involving plaintiff's claim that defendant neglected to furnish sufficient boom sticks to safely transport certain logs.

3. SET-OFF AND RECOUPMENT—TRIAL—CHARGE.

Where the defendant made no claim of set-off upon the trial and presented no requests for instructions to the jury on that branch of the case, the trial court did not commit reversible error in omitting to present the claim to the jury, although set-off was pleaded.

4. LOGS AND LOGGING—TOWING—NEGLIGENCE.

Evidence in an action for breach of contract to safely tow plaintiff's logs, considered, and *held*, not to have required the giving of a requested instruction that if the plaintiff hired the tugs and booms by the day, subject to a custom that the loss caused by the breaking up of the raft should be borne by the owner, the verdict of the jury must be for defendant.

5. SAME.

*Held*, also, that the charge of the court fairly presented the issues of the parties to the jury.

Error to Cheboygan; Sharpe, J., presiding. Submitted April 30, 1914. (Docket No. 47.) Decided June 1, 1914.

Assumpsit by John W. Karwick against Marion R. Pickands for breach of a contract to tow a raft of logs. Judgment for plaintiff. Defendant brings error. Affirmed.

*Victor D. Sprague,* for appellant.

*David H. Crowley* and *C. S. Reilley,* for appellee.

STONE, J. This case is before this court for the second time. For certain errors pointed out when the case was first here, it was reversed and sent back for a new trial. 171 Mich. 463 (137 N. W. 219). The former opinion contains a full statement of the issues involved, and it is not necessary to repeat that statement here.

The second trial of the case has resulted in a verdict and judgment for the plaintiff in the sum of $1,110.83, and the defendant has brought the case here for review, assigning errors in the admission of testimony, in the refusal of the court to give certain of defendant's requests to charge, and in the charge of the court, and also in failing to present defendant's set-off.

1. Upon the subject of the introduction of testimony, the most important matter discussed by counsel for appellant is the ruling of the trial court in permitting the testimony of Joseph Burnell, a witness for the plaintiff, given upon the former trial, to have been read in evidence upon this trial. It is the claim of appellant that no legal foundation for the introduction of this testimony was laid or shown, and that its introduction was prejudicial error.

Burnell was the plaintiff's boom man. Upon plaintiff's cross-examination he testified as follows, with reference to Burnell's whereabouts:

"I knew for two years prior to the hiring of Mr. Burnell that he was a boom man. He was living here off and on at that time. He was here at the former trial (two years before). I don't know whether he had a wife and children. The sheriff found him near St. Ignace. I know nothing about his family, nor where he is now."

On redirect examination plaintiff testified:

"I made some search and inquiry for the witness Burnell.

"Q. Did you learn where he was?

"A. Why I heard they was—

"*Defendant's Counsel:* We object to what he heard somebody say.

"*Witness:* I inquired of different ones around the hotel here, and people that came from St. Ignace where I first got him. They claim he said to them he was going West.

"*Defendant's Counsel:* That is objected to.

"*The Court:* I think that may come in as bearing simply upon the question of Mr. Burnell's whereabouts.

"*Witness:* They claimed that he went West—some of his friends that I got him of, the last trial from St. Ignace, that was about a month ago, or six weeks ago, that I made the inquiry. (Further objection and exception by defendant's counsel.)

"Q. Do you remember any statement that Mr. Burnell made with reference to his leaving the State, at the time or during the time of the last trial of this case? (Objected to as hearsay evidence. Objection overruled and exception.)

"*Witness:* He made the statement to me once that he was going to Seattle, Wash. That was at the former trial."

On recross-examination plaintiff testified:

"The people I inquired about as to Mr. Burnell's whereabouts were—I inquired of a fisherman (I don't know his name) in my hotel about six weeks ago. I talked to the sheriff of Cheboygan county. I didn't talk with anybody but the sheriff since I talked with the fisherman. The fisherman is the only man I have talked with except the sheriff. The fisherman is around St. Ignace or Mackinaw. I don't know his name. All I know about it is what this fisherman told me. I don't know that Burnell's family lives in Escanaba."

We gather from the record that the following affidavit of the sheriff of the county was read by the court, although it is stated that it was not offered in evidence:

"STATE OF MICHIGAN,
"COUNTY OF CHEBOYGAN—SS.

"Byron Watson being duly sworn deposes and says that on or about the 14th day of May, 1913, he was handed a written subpœna for Martin Chase and Joseph Burnell, together with proper fees for their service. * * * Deponent says further that he made due and diligent search and inquiry for the witness Joseph Burnell, and could not find him in the State of Michigan; that he made inquiries of every person that he could learn had formerly been acquainted with said Burnell, and has been unable to find him or make service of said subpœna in the State of Michigan, and deponent learned from such inquiry and search that said witness Burnell had left the State of Michigan, and was now in one of the western States."

Thereupon plaintiff's counsel offered to read the testimony of said Burnell taken upon the former trial, whereupon defendant's counsel objected and said:

"In the first place, I object to it on the ground that the proper showing has not been made for receiving it, first, because it could not be made by affidavit. In the second place, the showing is not sufficient in any event. So far as the affidavit of Mr. Watson is concerned, he is here in the courtroom, and he can be put on the stand and examined."

After some discussion, Mr. Watson, the sheriff, was sworn and cross-examined by defendant's counsel. He testified as follows:

"In reference to the affidavit. I received here in this city a subpœna for Mr. Burnell, as a witness in this case. I made some inquiry of people here in Cheboygan county, people that were witnesses in this case; I would not say they were all witnesses that I inquired of. I didn't make any inquiry at St. Ignace, nor write any letter over there, nor at Escanaba, as I had no idea I could get information from Escanaba. I made no inquiry except right here in the city of Cheboygan. What inquiry I made was of different witnesses, as I would subpœna them, and from two or three men that worked in the Embury-Martin mill

in this city. I inquired of people that were in Cheboygan, of different ones at the dock, but where they lived I could not say. That is the entire inquiry upon which I made this affidavit. I did not make any inquiry outside of the city of Cheboygan. I am the sheriff that made this affidavit. I could not swear whether I subpœnaed him before or not. I don't know where he came from before."

Examined by plaintiff's counsel, he further testified:

"I received this subpœna about May 14th. (The trial was June 10th.) I acted upon instructions you gave me with reference to making search and inquiry to find the witness, and I took the fees. The first man I looked up was Mr. Karwick. From that I inquired of different ones around the dock—tugmen. There was one man that I talked with knew Burnell. I wouldn't swear how many people I talked with, I might have asked 15 or 20.

"Q. In the service of this subpœna—in endeavoring to make the service of this subpœna—did you make such inquiry as was possible to be made to find out his whereabouts?

"Defendant's Counsel: We object to that also as a conclusion.

"The Court: I will let him answer. (Exception.)

"A. Well, I made such inquiry until I was satisfied that he was not here.

"Q. And was you satisfied from that search and inquiry, and from the information that you got, that he was not in the State of Michigan?

"A. I was. I said I thought—I was positive I inquired of three men that were working for the Embury-Martin Lumber Company, and one of these three was acquainted with him. I could not say whether the others were or not. Some one told me he was working for Mr. Swift in California. Some one here in this city, but I couldn't be positive who it was. I don't know whether that man knew of his whereabouts or not; it was hearsay. The only information that I have that he was out of the State is from what somebody told me, if I have any at all."

The testimony of the former witness Burnell was

then read to the jury, against the objection and exception of the appellant. Our reason for inserting here the foregoing testimony is because of the strenuous argument and claim of appellant that it was prejudicial error for the court to permit the testimony of Burnell to be read in evidence. An examination of the authorities cited shows the test to be: Was there any evidence that the witness was out of the jurisdiction, or could not be found after diligent search?

If there was evidence sufficient to call into exercise the judicial discretion, we ought not to disturb the ruling. We said in *Krouse* v. *Railway,* 170 Mich. 438, 443 (136 N. W. 434, 436), that:

"The sufficiency of such proof is largely in the discretion of the trial court, which will not be revised in the absence of evidence of gross abuse of such discretion. 16 Cyc. p. 1098; *Vaughan* v. *State,* 58 Ark. 353-372 [24 S. W. 885]."

In *Vaughan* v. *State, supra,* it was said:

"The trial judge should base his conclusions upon competent and relevant testimony, but its sufficiency is within his discretion, subject to be reviewed and corrected when abused."

We cannot say that there was here an abuse of discretion. We the more readily reach this conclusion because the testimony read had been given in the former trial of the same case, where the witness had been fully cross-examined by the same counsel as here, and where, as Greenleaf says, "the great and ordinary test of truth was no longer wanting," to wit, that of cross-examination.

2. We have examined the other assignments of error relating to the admission of evidence, and are of the opinion that no prejudicial error was committed.

3. Complaint is made that the court erred in fail-

ing to present defendant's defense of set-off. We have examined this record carefully, but in vain, to find that defendant made any claim of set-off upon the trial. It is true such claim was made in the pleadings. Upon the trial the captain of defendant's tug had testified that a portion of the towing bill of defendant was thrown off in the settlement with plaintiff. The following then occurred:

"*Q.* How much? (Objected to as immaterial by counsel for plaintiff.)

"*Defendant's Counsel:* It might be material in this way: If it should appear that we offered to throw off a portion of the bill for the purpose of settlement of the whole bill, and if they repudiate the settlement, we would be entitled to the balance of the bill.

"*The Court:* Do you claim for it in your set-off?

"*Defendant's Counsel:* Yes, your honor.

"*Plaintiff's Counsel:* Do you claim a set-off for the balance of the towing bill?

"*Defendant's Counsel:* Yes, if you repudiate the settlement.

"*Plaintiff's Counsel:* We withdraw our objection.

"*The Court:* He may answer.

"*A.* I think it was $120. That amount was thrown off, on condition that Mr. Karwick would settle without any trouble."

The above seems to be the sole claim made. When the plaintiff was being examined, the question arose as to the condition in which some of the logs were left when tied up at the pier, and whether the money paid by plaintiff to defendant was paid under protest. The court said:

"The point that they make, Mr. Sprague, is this: That they make this payment under protest, and under such conditions as justify that payment, under the situation the logs were in; that they were in danger of loss, if they were left there.

"*Defendant's Counsel:* We will admit that we refused to deliver, except upon payment of the money to us, and that payment was made under protest, after that demand was made.

"*The Court:* Do you admit further that the situation of the logs was dangerous; that it was dangerous to have left them where they were?

"*Defendant's Counsel:* I do not think that is material in any way, shape, or form. Now the only possible contention or reason that these men can advance for putting in this testimony is on the claim that we might possibly make that this payment was a settlement. Now we never did claim that or do claim that.

"*The Court:* In view of this statement, I do not think this testimony is material."

In view of the foregoing, and of the further fact that, although defendant presented at least 15 requests to charge, she did not call the attention of the court to the subject of a claimed set-off, we do not think she is in a position to urge that the court erred in that regard.

Thereupon the defendant requested the court to charge the jury as follows:

(2) "If you find from the evidence in this case that the plaintiff hired the tugs and booms of defendant by the day, and further find that the contract of hiring was made having in view a custom that in such case a loss caused by a breakup of the raft should be borne by the owner of the logs, and that such custom then existed, then you will find in favor of the defendant and against the plaintiff on plaintiff's claim for damages."

(5) "The plaintiff alleges that the defendant agreed to furnish sufficient boom sticks to make a double wrap around the logs and posts, and that she agreed to furnish at least 120 boom sticks for that purpose, and plaintiff alleges that defendant failed to furnish sufficient boom sticks to make a double wrap around said logs and posts of the plaintiff and failed to furnish at least 120 boom sticks for said purpose. You will remember that defendant denies making the agreements, but if you should find that the contract was as claimed by plaintiff, and that defendant failed to furnish the number of booms contracted to be furnished, you are hereby instructed that there

is no evidence in this case that the failure to furnish sufficient booms to make a double wrap around plaintiff's logs and posts and at least 120 boom sticks for that purpose in any way damaged the plaintiff. There is no proof that lack of boom sticks in number caused the damage plaintiff is suing upon in this case."

(9) "There is no proof in this case that plaintiff suffered any damage by reason of an insufficient number of booms being furnished."

(10) "The testimony in this case shows that the break in the boom was in the front of the boom up past where the logs were, and there is testimony tending to show that it was three or four sticks from the tug Kane. There is some testimony tending to show that the end of the boom pulled out. If you should find that the plaintiff's boom man, Burnell, examined this boom when he went over the boom and accepted it as such, and that he was authorized so to do, then the fact that this boom stick may not have been of good quality and sufficient size and strength for the intended use will not justify a verdict for the plaintiff. If the plaintiff's duly authorized boom man inspected the boom and accepted it, he accepted and approved of the quality, size, and strength of this boom stick, and if in that case plaintiff suffered a loss because this boom stick was not sufficient in size, strength, and quality, plaintiff cannot recover."

(12) "If Mr. Karwick introduced Mr. Burnell to Capt. Snetsinger as his boom man, and if Capt. Snetsinger was led to believe by plaintiff that Mr. Burnell was authorized to inspect and select the booms to be taken, and if you find that Mr. Burnell did inspect and select the booms to be taken and they were taken, then plaintiff cannot recover."

(13) "Plaintiff introduced evidence of an inspection tally of lumber shipped claimed to have been sawn from these logs of Karwick's. Plaintiff then attacked this scale or tally as being too large, because he claims logs overrun in lumber the scale in the woods. Opinion estimates of such overrun were then offered by plaintiff. Plaintiff now seeks by deduction of the alleged overrun from the lumber scale and comparison of the result with the woods' scale to recover verdict based thereon. You are instructed that such

is not the proper basis for recovery, if plaintiff should recover."

(14) "The method last stated furnishes an improper basis of recovery, *first,* because it compels defendant to pay for the overrun caused by the manufacture of the logs into lumber, and, *second,* it is not the best evidence introduced in this case of the loss, if any there was. The method stated is too vague and uncertain, in view of other evidence in the case, to form a proper basis of recovery."

(15) "It is the defendant's claim that the storm at the time of the breaking up of the boom was of such violence that, if the boom had not broken, to save the tugs it would have been necessary to cut the line holding the raft and set the raft adrift, and, failing to do this, the violence of the storm would have piled raft and tugs all on the beach, and defendant has offered testimony to sustain this claim of hers, and, if you find according to her claims in that respect, then it follows that, if the raft had been double-wrapped, as plaintiff claims it should have been, it would not have saved the raft and booms from going on the beach and going to pieces, and defendant is not liable for the loss of the raft, and you will find against his claim in that respect."

The court charged the jury in substance as follows:

"There is no dispute about the fact that some arrangement or agreement was entered into between these parties in the month of July, 1909, by which the defendant's tug and boom sticks should be used in bringing the timber, or logs belonging to the plaintiff, from where they were put in at Hammond's Bay up to the Lakeside Mill, somewhere near or in this city. But the parties differ as to what that arrangement or agreement was, and you have got to determine what it was from the evidence in the case.

"I shall state to you my understanding of what their claim is in connection with it; but I want to say to you at the outset that you should not, from anything that I may say, endeavor to form any opinion as to what I think the facts are, or have proved, because that is a matter for you to determine, and not for me. But it is necessary, in order for me to lay down the

principles or rules of law governing it, for me to state what the claims of the parties are.

"Now the claim of the plaintiff is that the agreement that he made with Mrs. Pickands (and he does not claim that it was made with her personally; there is not any dispute about the fact that Capt. Snetsinger and her husband had authority to act for her, and any contract that they made with the plaintiff is as binding as though she had made it herself; there is no dispute about that).

"As I was saying: The claim of the plaintiff is that the contract that he made with her through these agents was that he should pay her so much for the use of her tug and boom sticks, and that she thereupon engaged, through her servants, to see to it that those logs were properly boomed with sufficient boom sticks to double-wrap them and safely convey those to the Lakeside Mill slip. The defendant denies that. Her claim is that the only thing that she was to do was to furnish the tug and the boom sticks; that the selection of the boom sticks was to be made by some one appointed or selected by the plaintiff himself; that he was to pick out a boom man; and that she was to furnish whatever boom sticks were necessary to do that work.

"Now you can see where the distinction comes in. Each claims that the number and character of the boom sticks was to be determined by the other. The claim of the plaintiff is that they were to be good boom sticks, sufficient for that class of work, and that the boom sticks were not. You can see how they materially differ as to what the contract was between the parties; and it is sometimes a very difficult task for the jurymen, when there is such conflict in the evidence, to determine what the truth of the matter is; but that is what you must do in this case.

"Now if you find that the claim of the plaintiff is true, if you find that the defendant agreed to furnish a sufficient number of boom sticks to double-wrap this raft, and that she agreed to furnish good boom sticks, and that the selection was to be made by her, or her servants, and not by the plaintiff, or his servants, and you find that this loss was occasioned on account of the absence of a sufficient number of boom sticks to

double-wrap the raft, or on account of the quality of the boom sticks not being reasonably efficient, then I say to you, as a matter of law, the plaintiff would have a right to recover. And I will speak to you later about the damages which he will be entitled to recover.

"On the other hand, if you find that the claim of the defendant is true, if you find that all the defendant had to do under the contract was to furnish the tug and whatever boom sticks the plaintiff wanted, and that the plaintiff selected a man, and that he went, and had authority from the plaintiff, to pick out such boom sticks as to number and quality as he wanted, and that the burden was on him, and not on the defendant as to the number of boom sticks, to determine the number of boom sticks which was to be furnished, and to pick out the kind and quality that were to be taken, then the defendant has done all that she agreed to do, through her agents, in connection with the contract. And, no matter what loss may have occurred to the plaintiff, she is not liable for it.

"Now I do not know as I can make that any plainer to you. Counsel do not differ seriously about the legal proposition involved. The proposition they differ on is as to what facts are established—what the contract was—and, as I said to you, that is a matter that you, as jurymen, must assume the duty of ascertaining and determining from the testimony here submitted.

"It is the further claim of the defendant in this case that even if you should find, as the plaintiff claims, that the defendant agreed to furnish a sufficient number of boom sticks to double-wrap this raft, and that the defendant failed, and committed a breach of the contract in that respect, it is still the claim of the defendant that that negligence or omission on her part was not the cause of the loss that the plaintiff sustained. The claim of the defendant is that the loss was occasioned by the storm. Her claim is that under the evidence in this case the jury should find that, even though the raft had been double-wrapped with boom sticks, the probability is that it would have gone ashore the same as it did; and, if so, that the loss was occasioned by what we in law term the act of

God (that is, by the storm), and was not due to any negligence on the part of the defendant. Now if you find that to be true, under the evidence, that of course would release the defendant from liability, even if you should find that there was a negligence or omission on her part to discharge the duty devolving upon her under the contract, as you may find the evidence in that respect, because all contracts are made having in view what we term the act of God (that is, the act of the elements, in this case). It is the same thing.

"Something has been said about these boom sticks not being of good quality. I think I covered that in my former statement. If the defendant was to furnish the boom sticks (I mean if the defendant was to supply the boom sticks), the duty devolved upon her to determine how many and what boom sticks should be taken; it was her duty to take a sufficient number to double-wrap, and it was her duty to have taken boom sticks of such reasonably good quality as would perform the duty required of them.

"On the other hand, if the duty of selection, both as to quantity and quality, was on the servant of the plaintiff, why the defendant, of course, would not be in any way liable for any negligence or omission on his part, either as to quantity or quality. The plaintiff would be chargeable with the fact that his own servant had picked out the boom sticks, and if they were not of a proper and suitable quality or number, on that account.

"Some requests have been handed up to me. I will read a number of them to you, and they state propositions of law by which you should be governed. I think, perhaps, I have covered the substance of them in what I have said to you; but as a matter of precaution, for fear that I have not, I read them to you. Where I have covered them in the general charge, I do not want you to think I am laying particular stress upon any phase of the case, by reading these requests, but they do state propositions of law by which you should be governed, just the same as I have given them to you voluntarily and without having been requested to do so.

"If you find that the plaintiff hired defendant's tug and booms, and that defendant did not agree to furnish any particular number of booms, and that plain-

tiff's boom man, Burnell, looked over the booms and directed what booms should be taken, and had authority so to do, and such booms were taken and furnished by defendant, then I charge you that plaintiff, by his boom man, accepted said booms as sufficient, and your verdict must be for the defendant, and against the plaintiff, no cause of action, so far as plaintiff's claim for damages is concerned.

"If you find that the contract for hiring the tug and booms was as claimed by plaintiff, but that plaintiff introduced Burnell to defendant's servants as his boom man, and if you further find that Burnell looked over the booms and directed what booms were to be taken, and that he had authority so to do, and that such booms were taken and furnished by defendant, then I charge you that plaintiff accepted said booms as sufficient, and a sufficient compliance with the contract, and your verdict must be in favor of the defendant and against the plaintiff on his claim of damages.

"If you find that plaintiff told defendant's representative that he had only 200,000 to 225,000 feet of logs, and that defendant contracted to furnish and did furnish sufficient and suitable booms to properly inclose, as per contract, that amount of logs, and that plaintiff put in more than 225,000 feet (some of the evidence tends to show 248,497 feet), and that because thereof the boom broke, then I charge you that the plaintiff cannot recover on his claim for damages.

"I further charge you that if you should find defendant did contract to furnish sufficient and suitable booms to properly inclose, as provided by the contract, 200,000 to 225,000 feet of logs, then, presumptively, she contracted with reference to the average run of logs; and if you find that plaintiff's logs were smaller than the average, and that fact was unknown to the defendant, and by reason of those logs being smaller they required more booms, and because thereof the boom broke, in that event plaintiff cannot recover on his claim for damages.

"If you find, gentlemen of the jury, that the plaintiff, through his authorized boom man, Burnell, accepted the booms to be taken, the fact that Mr. Karwick said to Capt. Snetsinger, at the raft, 'The booms are in your charge,' if he did say so, would

not place the responsibility on defendant for a breaking up of the raft caused by the booms not being sufficient in number or quality.

"If Mr. Burnell, the boom man for the plaintiff, examined the boom stick and its connection where the break in the boom occurred, prior to the taking of the same to Hammond's Bay, and was authorized to and did accept the same as sufficient, plaintiff cannot recover for any loss he may have sustained because of a break in that boom stick and connection. (And where I read 'authorized to,' I mean authorized by the plaintiff, Mr. Karwick.)

"If you find from the evidence that Mr. Karwick introduced Mr. Burnell to Capt. Snetsinger as his boom man, and if you further find that Mr. Karwick knew that Mr. Burnell was to inspect and select the booms to be taken, and you find that Mr. Burnell did inspect and select the booms to be taken to handle these logs, and they were taken, then the plaintiff cannot recover.

"Counsel calls my attention to the fact that the claim of the plaintiff is that an additional number of booms were to be brought. I of course intended to cover that, and it would be improper not to speak of it. The theory of the plaintiff of course is that the burden was upon the defendant to determine the number of boom sticks and the quality. The theory of the defendant is that the burden was upon the plaintiff; that he authorized his boom man; and he was to determine the number of boom sticks and quality. And, where I have spoken here of Mr. Burnell selecting the number of sticks and the quality, of course that would apply to the number that were to be brought down by the second tug as well as taken by the first tug.

"There is evidence—the plaintiff has offered evidence, and it is his claim that the second tug, the Thomas Kane, when it was to come down, was to bring some additional boom sticks. The only thought there is in connection with that at all (and I hope that the requests I have read will not be misleading to you) is the question as to who, under the contract, had this selection; whose duty it was to determine how many boom sticks were to be taken and the qual-

ity that were to be taken. Now it is the claim of the plaintiff that that was the defendant's duty, and was a part of her contract, was to furnish a sufficient number of boom sticks to double-wrap this raft, and that she did not furnish them.

"It is the claim of the defendant here that she did not have anything to do with the number of boom sticks; that the plaintiff's man, Burnell, was to determine how many boom sticks were to be taken; and that he went there and picked them out."

The court then charged the jury upon the subject of damages, in which we find no error.

4. Error is assigned in each instance because the court refused to charge as above requested.

Referring to the second request to charge, we are of opinion that the evidence did not warrant the giving of the request, and that there was no error in refusing it. We have set forth the substance of the charge, from which it appears that defendant's other requests to charge were sufficiently covered by the general charge. Taking the charge as a whole, we are of opinion that it presented the issues in a full and fair manner, and was warranted by the evidence.

Finding no reversible error in the record, the judgment of the circuit court is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.